IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EMORY JOHNSON, JR., )
      Plaintiff, )
)
v. ) 1:03CV00980
)
ALUMINUM COMPANY OF AMERICA, )
      Defendant. )
_____ )

MEMORANDUM OPINION

TILLEY, Chief Judge

     The plaintiff, Emory Johnson, Jr., filed suit on October 20, 2003 against his former employer, Aluminum Company of America ("ALCOA"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. This case involves several incidents of racial discrimination and retaliation that are alleged to have occurred at the defendant ALCOA's plant in Badin, North Carolina. It is now before the Court on the Defendant's Motion for Summary Judgment [Doc. # 16]. For the reasons set forth below, the defendant's motion is GRANTED.

I.

     The facts taken in the light most favorable to the non-moving party are as follows: Mr. Johnson, an African American, was employed by ALCOA from approximately 1969 to 2002. Most recently, he worked as a Crane Operator in the Potroom at ALCOA's Badin plant. The Crane Operator is responsible for placing "rodded anodes," or blocks of carbon, in the individual pots where raw

1

alumina is converted into aluminum. These individual pots are linked together in a "Potline" through an electrical current. Mr. Johnson's position requires a considerable amount of skill: if the Crane Operator fails to place the rodded anodes correctly in the pots, this may disrupt the Potline and cause the individual pots to turn over, potentially injuring other workers. Mr. Johnson was widely recognized by his supervisors and coworkers in the Badin plant for the considerable skill with which he carried out his duties as a Crane Operator. (Def.'s Mem. Supp. Summ. J., 3; Pl's. Resp., 2.)

In 1999, the Badin facility, faced with rising costs and falling revenues, implemented a plant-wide cost reduction plan, called "Reconstruction." If the plant did not achieve significant cost savings under this plan, it was very likely that it would be closed. The goal of Reconstruction was to maintain current production levels while at the same time working to reduce costs. Among the initiatives undertaken during Reconstruction was a large scale "workplace redesign" in which a number of jobs were either re-classified or eliminated. For example, in the Potroom, the positions of Crane Operator, Tapper Helper, and Pot Servicer were combined into the new position of Smelter Operator. Nonetheless, despite the cost savings effort undertaken through Reconstruction, in the summer of 2002, ALCOA announced that it was discontinuing aluminum production at the Badin plant. At that time, the facility employed approximately 300 people. In October of 2002, 161 employees were laid off as a result of the shutdown of aluminum production

2

at the Badin plant.

Employees at Alcoa's Badin plant are represented by the United Steelworkers of America ("the Union"). The Union and ALCOA negotiated a Collective Bargaining Agreement ("CBA") which governs the terms and conditions of the employment of workers at the Badin plant and sets forth procedures for filing grievances. While employed with ALCOA, Mr. Johnson filed a number of grievances with the Union. In addition, in early 1999, Mr. Johnson, along with eighty-six other African American employees of the Badin plant, filed a discrimination complaint with the Department of Labor, Office of Federal Contract Compliance ("OFCCP"). Mr. Johnson is also a plaintiff in another lawsuit against ALCOA, also alleging racial discrimination, harassment and retaliation, Williams et al. v. ALCOA, No. 1:00CV00379. The parties to the Williams case agreed that all claims in that case would be limited to events prior to November 1, 2000. Therefore, Mr. Johnson's present case concerns events following November 1, 2000.

In this case, Mr. Johnson alleges five specific incidents of racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. These include: (1) a one and a half year delay in receiving training for the newly-created position of Smelter Operator; (2) a five day suspension from work in July of 2001; (3) denial of his request for a job as a Tapper Helper in February of 2002; (4) being given extra,

3

more difficult work during overtime shifts compared to white employees; and (5) his layoff in October of 2002.

The first incident concerns Mr. Johnson's request to be trained for the newly-created Smelter Operator position. He requested this training in February of 2001, but did not receive it until the fall of 2002. The training ultimately took just three days. During this period, Mr. Johnson was not eligible for the overtime work that would have come with this position and therefore lost a number of opportunities to earn overtime pay.

In July of 2001, Mr. Johnson was suspended from work for five days and ordered to attend counseling sessions because of a comment he was alleged to have made about bringing an AK-47 to work. After ALCOA conducted an investigation, it was determined that Mr. Johnson had not made the comment and had been suspended in error. He was therefore reinstated and paid for the five days he was suspended. Mr. Johnson contends that he lost opportunities for overtime pay during the five days in which he was not working.

In February of 2002, one of Mr. Johnson's supervisors, George Burleson, announced that there was an opening for the position of Tapper Helper in the Potroom. Mr. Johnson applied for the job, but was told that he could not have it. Under the Collective Bargaining Agreement, the most senior employee applying for an open position with the company is entitled to that position. (Pl.'s Resp., Ex. 4, CBA, Art. IV, § 33.) However, the Tapper Helper position was given to a less

4

senior, white employee. Mr. Johnson also contends that, throughout his employment with ALCOA, he was routinely given more work during overtime shifts than similarly situated white employees. He believes that this practice became more common after the filing of the Williams lawsuit.

Finally, Mr. Johnson alleges that he was discriminated against and retaliated against for his participation in the Williams lawsuit when he was laid off in October of 2002. The Potroom was closed when aluminum production was ended at the Badin facility in 2002 and Mr. Johnson's position was eliminated. However, Mr. Johnson contends that his seniority entitled him to another position at the Badin plant under the Collective Bargaining Agreement.

## II.

Summary judgment is appropriate only when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(e). Material facts are those facts identified by the controlling law as essential elements of the claims asserted by the parties. Thus, the materiality of a fact depends on whether the existence of that fact could cause a jury to reach a different outcome. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). A genuine issue of material fact exists if the evidence is sufficient for a reasonable trier of fact to find in favor of the nonmoving party. Anderson, 477 U.S. at 248. There is no genuine issue of material fact if the nonmoving party fails to make a sufficient

5

showing on an essential element of its case as to which it would have the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In evaluating a motion for summary judgment, the court must view the facts, and the inferences reasonably to be drawn from them, in the light most favorable to the nonmoving party. See Fed. R. Civ. P. 56(e). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. Anderson, 477 U.S. at 249. In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. The party opposing the motion may not rest upon its pleadings but must instead provide evidence or point to evidence already on the record that would be sufficient to support a jury verdict in its favor. Anderson, 477 U.S. at 248.

In order to prove a claim of racial discrimination under Title VII or § 1981, a plaintiff may provide direct evidence of discrimination, such as "conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision," or, in the absence of such direct evidence, the plaintiff may proceed using circumstantial evidence under the burden-shifting proof scheme established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Taylor v. Virginia Union Univ.,193 F.3d 219, 232 (4th Cir. 1999).

Under McDonnell Douglas, a plaintiff's prima facie case of discrimination

6

creates an inference that the employment action was based on unlawful discrimination. To establish a prima facie case of discrimination, the plaintiff must show: (1) he or she is a member of a protected class; (2) he or she suffered an adverse employment action; (3) at the time of the adverse employment action, he or she was performing at a level that met the employer's legitimate job expectations; and (4) the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination." E.E.O.C. v. Sears Roebuck & Co., 243 F.3d 846, 851 (4th Cir. 2001). If the plaintiff meets this initial burden, a presumption of discrimination arises, and the burden shifts to the defendant to produce, but not to prove, a "legitimate, nondiscriminatory reason" for its decision. Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 254 (1981). If the defendant meets its burden, the presumption of discrimination that arose from the prima facie case disappears, and the burden of proof is left with the plaintiff to show that the employer acted with a discriminatory intent and that its proffered explanation was a pretext for discrimination. Id. at 252-53. However, if a plaintiff fails to establish a prima facie case of discrimination or fails to raise a genuine factual dispute concerning the employer's non-discriminatory explanation for the alleged discriminatory act, the defendant is entitled to summary judgment. Henson v. Liggett Group, Inc., 61 F.3d 270, 275 (4th Cir.1995).

7

**III.**

Under the McDonnell Douglas paradigm, Mr. Johnson has established a prima facie case of racial discrimination. He is an African American and was denied training or overtime opportunities at the Badin plant on several occasions. By ALCOA's own admission, Mr. Johnson was one of the most skilled crane operators in the Badin facility. (Def.'s Mem. Supp. Summ. J., 3.) In addition, there are circumstances present in this case from which a factfinder could infer that discrimination occurred. Two facts in particular could support this inference: (1) ALCOA took nearly a year and a half to provide Mr. Johnson with training that ultimately took just three days and (2) Mr. Johnson was one of the most senior employees at the Badin plant at the time of the lay-offs in October of 2002. The burden therefore shifts to ALCOA to provide a legitimate business reason for the practices that Mr. Johnson has complained of.

ALCOA contends that during Reconstruction the company reserved the right to train workers in a manner that would minimize workplace disruption. (Kessler Aff. ¶ 16, July 28, 2004.) Therefore, the delay in Mr. Johnson's training for the Smelter Operator position was due to a need to keep the Potroom running smoothly while, at the same time, implementing major changes to the way the facility was structured. Moreover, because all of the Potroom employees were paid the increased hourly wage of a Smelter Operator regardless of whether they had been trained for the position, ALCOA and the Union had agreed that training

8

would proceed as time permitted. (Kessler Aff. ¶ 13, Oct. 3, 2005.) Indeed, one of Mr. Johnson's supervisors, Yousef Suleyman, testified during his deposition that it was a considerable logistical feat to schedule the employee training for the Smelter Operator position. (Suleyman Dep., 21.) In addition, a new Potline was opened when the Smelter Operator position was created, causing a shortage of trained Crane Operators in the Potroom. Because of Mr. Johnson's skill as a Crane Operator, he was needed to help with the additional work created by the new Potline. This also contributed to the delay in Mr. Johnson's training. (Burleson Aff. ¶¶ 8, 11.)

According to ALCOA, it was because of Mr. Johnson's considerable skill as a Crane Operator that he was denied the Tapper Helper position and sometimes given more work during overtime shifts. ALCOA contends that Mr. Johnson was too valuable as a Crane Operator to move him to the less-skilled position of Tapper Helper. (Def.'s Mem. Supp. Summ. J., 18.) In fact, Mr. Johnson acknowledged during his deposition that this may have been why his supervisor wished to keep him as a Crane Operator instead of moving him to the Tapper Helper position. (Johnson Dep., 151.) He also admitted that one of the reasons he could have been given more work during overtime shifts was because he was so skilled. (Johnson Dep., 202-04.)

Regarding the 2001 suspension, ALCOA asserts that it has a legitimate

9

business interest in acting quickly to ensure the safety of its workplace.[1]  Mr. Johnson acknowledged that the company's response would have been reasonable if he had in fact made the comment about the AK-47.  (Johnson Dep., 139-40.)  The company acknowledged its mistake in suspending Mr. Johnson and reinstated him, with backpay, as soon as it learned of the error.  ALCOA also notes that the white employee who was ultimately determined to have made the comment received the same punishment as Mr. Johnson did.

Finally, ALCOA says that Mr. Johnson was laid off in October of 2002 because the Potroom had been closed, and thus Mr. Johnson's position eliminated, as a result of the shutdown of aluminum production at the Badin plant.  Moreover, Mr. Johnson was not eligible for any of the remaining jobs at the plant because, despite his seniority, he was not "presently qualified" for any of those positions.  Under the Collective Bargaining Agreement, which governed how the layoffs were carried out, the most senior, presently qualified employees were to be transferred to any remaining positions.  (Kessler Aff. ¶¶ 22-25, July 28, 2004.)  Accordingly, in order to determine who was presently qualified for those positions, the Human Resources department looked at each employee's job history and training information.  (Id. ¶ 27.)  A list of employees, including Mr. Johnson, who were not presently qualified for another position and thus would have to be laid off was

---

[1] It is not clear that, standing alone, this incident could support a prima facie case of discrimination.  However, even if it did, ALCOA has a legitimate business reason for its actions.

10

compiled based on this information.  ALCOA also notes that it negotiated an agreement with the Union through which employees who wished to challenge the determination that they were not presently qualified for another position in the Badin plant could do so.  (Def.'s Mem. Supp. Summ. J., Ex. J, Curtailment Agreement.)  Mr. Johnson did not make use of this procedure.

ALCOA has provided a legitimate business reason for each of the incidents of alleged discrimination described by Mr. Johnson.  The burden therefore shifts to Mr. Johnson to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000).  Mr. Johnson has not carried this burden.

As far as the Smelter Operator training is concerned, Mr. Johnson's training was most certainly delayed.  However, ALCOA was in the midst of a major restructuring effort in its Badin facility and therefore chose to conduct employee training in the least disruptive manner possible.  Although Mr. Johnson contends that the Collective Bargaining Agreement mandates that training is done based on employee seniority (Pl.'s Resp., 10.), it is not clear that the section of the Agreement that he relies upon supports this position.[2]  Mr. Johnson also points to

---

[2] Mr. Johnson points the Court to Art. IV, § 17, ¶ F of the Collective Bargaining Agreement.  (Pl.'s Resp., Ex. 4.)  This section of the agreement appears to concern the training of employees who have been transferred to new positions.  It does not address whether seniority governs training assignments.  The Court has reviewed those portions of the Agreement that the parties have provided and has

11

the testimony of one of his supervisors, Yousef Suleyman, who says he was told not to assign Mr. Johnson to overtime shifts because he had not received the Smelter Operator training yet. (Suleyman Dep., 28.) However, this statement is not inconsistent with ALCOA's explanation for wanting to keep Mr. Johnson working as a Crane Operator. Moreover, Mr. Johnson admitted during his deposition that his supervisors told him his training would be delayed because his skills as a Crane Operator were needed elsewhere. (Johnson Dep., 26-27.) In addition, as mentioned earlier, Mr. Suleyman also testified that the delay was not surprising given the considerable logistical difficulties involved in scheduling the training for all the Potroom employees. (Suleyman Dep., 21.) Mr. Johnson has therefore failed to create a genuine issue of material fact as to whether ALCOA's explanation for the delay of the Smelter Operator training is pretextual.

Both parties admit that Mr. Johnson was widely known in the Badin plant for his skill as a Crane Operator. (Def.'s Mem. Supp. Summ. J., 3; Pl.'s Resp., 2.) ALCOA says Mr. Johnson may have been given more work during overtime shifts because of this skill. The company also asserts that it chose to keep Mr. Johnson as a Crane Operator instead of giving him the Tapper Helper position because he was so good at the job. Mr. Johnson argues that there was no shortage of trained Crane Operators by the time he applied for the Tapper Helper position and thus

---

not found any section directly addressing this issue. See also, Kessler Aff. ¶ 14, Oct. 3, 2005.

ALCOA's proffered reason is pretextual. (Pl.'s Resp., 11.) However, even if there was an adequate number of Crane Operators in the Badin plant by this time, ALCOA could have still chosen to keep Mr. Johnson on as a Crane Operator because of his superior skill. As mentioned earlier, Mr. Johnson acknowledged during his deposition that his skill as a Crane Operator may have been the reason he was denied the Tapper Helper position. (Johnson Dep., 151.) Thus, he has failed to provide sufficient evidence from which a factfinder could conclude that ALCOA's stated business reason is pretextual. Similarly, Mr. Johnson has not provided any evidence from which one could conclude that ALCOA's response to the AK-47 incident was improper.

Finally, as to the October, 2002 layoffs, Mr. Johnson has not created a genuine issue of material fact as to whether he was presently qualified for another position with ALCOA. The ALCOA Human Resources Department examined each employee's job and training history to determine who was presently qualified for the remaining positions. Ultimately, Human Resources determined that Mr. Johnson did not have the necessary qualifications for one of these jobs. Mr. Johnson, however, points to a statement made by Mr. Suleyman during his deposition where he said he believed Mr. Johnson was qualified for other positions in the plant at the time of the layoffs. (Suleyman Dep., 31-32.) However, Mr. Suleyman does not appear to have been in any way involved in the layoff process. See Rowe v. Marley Co., 233 F.3d 825, 831 (4th Cir. 2000) (non-decisionmaker's

13

inconsistency with decisionmaker's proffered reason was not probative of pretext where plaintiff failed to discredit the decisionmaker's explanation). Moreover, Mr. Johnson admitted during his deposition that he would have needed additional training to move to one of the remaining positions in the plant. (Johnson Dep., 86.)

Mr. Johnson has failed to create a genuine issue of material fact as to whether ALCOA's proffered business reasons for the five incidents described above are a pretext for discrimination. Therefore, he has not carried his burden under the <u>McDonnell Douglas</u> framework and the defendant ALCOA is entitled to summary judgment.

## IV.

Mr. Johnson urges the Court to apply the so-called "mixed-motive" analysis to the facts of this case. (Pl.'s Resp., 8.) Under this framework, Mr. Johnson can establish a claim of racial discrimination if he demonstrates that ALCOA's decision, while partly based on a legitimate, nondiscriminatory reason, was also motivated by racial bias on the part of a "relevant decisionmaker." See <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003); <u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, 354 F.3d 277 (4th Cir. 2004). A relevant decisionmaker possesses "such authority as to be viewed as the one principally responsible for the [employment] decision . . ." <u>Hill</u>, 354 F.3d at 291. A plaintiff may satisfy his burden under the mixed motive framework by providing either circumstantial or direct evidence of discrimination.

14

Desert Palace, 539 U.S. at 99-101.

In this case, Mr. Johnson has not provided the Court with any evidence of racially discriminatory motives on the part of the relevant decisionmakers at ALCOA. He has not alleged that any of the persons involved in the incidents he describes made any reference to his race or harbored any kind of discriminatory animus towards him because of his race. Therefore, Mr. Johnson has not carried his burden under the mixed motive framework.

**V.**

Mr. Johnson also contends that the five incidents described above occurred because he was being retaliated against by ALCOA for participating in the Williams lawsuit.

Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove (1) that he engaged in a protected activity; (2) that an adverse employment action was taken against him; and (3) that there was a causal connection between the first two elements." Dowe v. Total Action Against Poverty, 145 F.3d 653, 656 (4th Cir.1998).

It is undisputed that Mr. Johnson engaged in protected activity when he became a plaintiff in the Williams lawsuit. However, it is not clear that all of the

15

five incidents alleged by Mr. Johnson can be considered adverse employment actions. The Fourth Circuit has defined "adverse employment actions" as those that effect the terms, conditions or benefits of employment. Munday v. Waste Mgmt. of North America, Inc., 126 F.3d 239, 243 (4th Cir. 1997), cert. denied, 522 U.S. 1116 (1998). The denial of the Tapper Helper position is not an adverse employment action as this position paid less than that of a Crane Operator and did not offer Mr. Johnson more access to overtime. (Johnson Dep., 142.) Similarly, although Mr. Johnson claims that he was given extra work during overtime assignments, he does not explain how this extra work altered the "terms, conditions or benefits" of his employment. Moreover, Mr. Johnson has admitted that he was not always given more work. (Johnson Dep., 205.) Finally, regarding the AK-47 incident, Mr. Johnson was reinstated with back pay as soon as the company determined that he had not made the threatening comment. See Thompson v. Potomac Elec. Co., 312 F.3d 645, 651 (4th Cir. 2002) (employee who did not lose pay and maintained the same position after employer's disciplinary actions did not suffer an adverse employment action). Mr. Johnson has not made a prima facie case of retaliation with respect to these three incidents.

Furthermore, it is not clear that the delay in receiving the Smelter Operator training altered the terms, conditions or benefits of Mr. Johnson's employment -- particularly as all Potroom employees were paid the same hourly rate regardless of whether they had received the training -- and thus constitutes an adverse

16

Case 1:03-cv-00980-NCT   Document 43-2   Filed 10/26/05   Page 16 of 18

employment action.  However, even if it were, Mr. Johnson has not established a causal connection between the delay in his training and his participation in the Williams lawsuit.  Nor has he done so with respect to the October, 2002 layoffs.  Mr. Johnson does not allege any specific facts on which he bases his belief that he was retaliated against beyond the fact of his participation in the Williams lawsuit.  There is nothing in the record connecting his participation in the lawsuit to the layoff and training delay besides Mr. Johnson's own opinion.  See Mackey v. Shalala, 360 F.3d 463, 469-70 (4th Cir. 2004) ("A plaintiff's own self-serving opinions, absent anything more, are insufficient to establish a prima facie case of discrimination."); Olivares v. Nat'l Aeronautics & Space Admin., 934 F.Supp. 698, 705 (D. Md. 1996) (employee's "say so" is insufficient to satisfy the causal connection requirement of a prima facie case of retaliation).  Moreover, three of the employees who were trained for the Smelter Operator position before Mr. Johnson were also plaintiffs in the lawsuit and at least six of the plaintiffs in the Williams lawsuit remained employed by ALCOA after the layoffs.

Finally, it is also worth noting that the Williams lawsuit was filed in 2000, but Mr. Johnson was not laid off until October of 2002.  "Generally, the passage of time . . . tends to negate the inference of discrimination."  Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004).  See also Dowe v. Total Action Against Poverty, 145 F.3d 653, 657 (4th Cir.1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse

17

employment action . . . negates any inference that a causal connection exists between the two."). Mr. Johnson has failed to make a prima facie case of retaliation.

### VI.

Mr. Johnson has failed to provide sufficient evidence to create a factual dispute as to whether ALCOA's proffered business reasons are a pretext for discrimination under the McDonnell Douglas burden shifting scheme. Nor has he demonstrated, through sufficient direct or circumstantial evidence, that his race was a motivating factor in ALCOA's employment decisions. He has also failed to make a prima facie case of retaliation with respect to his participation in the Williams lawsuit and the five incidents of alleged discrimination. Therefore, the Defendant ALCOA's Motion for Summary Judgment [Doc. # 16] shall be GRANTED.

This the day of October 26, 2005

/s/ N. Carlton Tilley, Jr.
United States District Judge